

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

| | | |
|---|---|---|
| Rod J. Rosenstein<br>*United States Attorney*<br><br>Jefferson M. Gray<br>*Assistant United States Attorney* | *96 South Charles Street*<br>*Fourth Floor*<br>*Baltimore, Maryland 21201* | DIRECT: 410-209-4915<br>MAIN: 410-209-4800<br>FAX: 410-962-3091<br>TTY/TDD: 410-962-4462<br>Jefferson.M.Gray@usdoj.gov |

May 15, 2013

Mr. Robert Biddle, Esq.
Nathans & Biddle LLP
120 East Baltimore Street
Suite 1800
Baltimore, MD 21202

      Re: *United States v. Larry Michael Parrish*
         Criminal No. JFM-12-0342

Dear Mr. Biddle:

    This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by the close of business on Monday, May 20th, it will be deemed withdrawn. The terms of the agreement are as follows.

### Offense of Conviction

    1. The Defendant agrees to plead guilty to Count 18 of the Indictment now pending against him, which charges him with wire fraud, in violation of 18 U.S.C. § 1343. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offense

    2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

- First, there was a scheme or artifice to defraud, or to obtain money by means of materially false and fraudulent pretenses, representations and promises, as charged in the Indictment;

- Second, the Defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with the

specific intent to defraud, or that he knowingly and intentionally aided and abetted others in the scheme; and

- Third, in the execution of the scheme, the Defendant caused the use of interstate and/or international wires, as specified in the Indictment and in the attached Statement of Facts.

### Penalties

3. The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: twenty (20) years of imprisonment, followed by a three (3) year term of supervised release, and a fine of up to $250,000.00, or (pursuant to 18 U.S.C. § 3571(d)) the greater of twice the defendant's gross gain or the victims' gross loss. In addition, the Defendant must pay $100.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked – even on the last day of the term – and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

### Waiver of Rights

4. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

(a.) If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

(b) If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2



otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

(c) If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

(d) The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

(e) If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

(f) By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

(g) If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

(h) By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his/her attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he/she wants to plead guilty regardless of any potential immigration consequences.

3



## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. (a) This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which the parties agree this Office would have proved beyond a reasonable doubt if this matter had proceeded to trial, and to the following applicable sentencing guidelines factors:

The base offense level in this case is a level **seven (7)**, pursuant to U.S.S.G. § 2B1.1(a)(1). The parties agree that the amount of the loss in this case under the governing case law which was caused by the defendant's conduct is the full amount taken in by his scheme, which was $9.2 million, and thus a **twenty (20)** level enhancement is merited pursuant to U.S.S.G. § 2B1.1(b)(1)(K).

There are substantial disagreements between the parties concerning other guidelines enhancements that the government maintains apply in this case, and a reduction that the defendant maintains should apply, as set forth in ¶s 9 and 10 below.

This Office does not oppose a **two (2)** level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **one (1)** level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

4

*RWB*

8.      This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range and application of the 18 U.S.C. § 3553(a) factors, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines or variances pursuant to 18 U.S.C. § 3553(a) will be raised or are in dispute, except as noted in ¶s 9 and 10 below.

## Guidelines Factors Not Stipulated

9.      The government maintains that the following additional guidelines enhancements are applicable here and should be applied in calculating the defendant's offense level under the U.S. Sentencing Guidelines, and that the Court should enter an additional factual finding as part of the facts found in this case, as set forth below. The defense maintains that these guideline factors are not applicable and intends to contest both these and the additional factual finding at sentencing.

(a)     An additional **four (4)** level enhancement is applicable pursuant to U.S.S.G. § 2B1.1(b)(2)(B) because the number of victims in this case (69) is greater than 50 but less than 250 persons;

(b)     A further **two (2)** level enhancement applies pursuant to U.S.S.G. § 2B1.1(b)(9)(C) because the defendant's conduct constituted a violation of two prior judicial orders – the temporary restraining order previously entered in the *Z-Par Holdings* case on April 14, 2005 that enjoined him from "(1) employing any device, scheme, or artifice to defraud; or (2) obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or: (3) engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser" in violation of the Securities Act of 1933, and the further final judgment entered by the United States District Court for the District of Maryland in the *Z-Par Holdings* case on April 26, 2007 which, which permanently enjoined him from violating the securities laws by committing fraudulent acts.

(c)     An additional **two (2)** level enhancement applies pursuant to U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved sophisticated means, including attempts by the defendant to open up a bank account for IV Capital on the West Indian island of Nevis; his ultimate use of a bank account at Bermuda Commercial Bank to conduct the financial transactions of IV Capital; and his use in conducting the business of IV Capital of two e-mail accounts provided by Safe-mail.net, an Israeli Internet Service Provider (ISP), whose server was located on the Isle of Man.

(d)     Finally, the government maintains that because the defendant had fiduciary responsibilities with regard to the investors in IV Capital, a further **two (2)** level enhancement applies for abuse of a position of private trust pursuant to pursuant to U.S.S.G. § 3B1.3.

5

(e) The government maintains that the following additional factual finding should be made at sentencing and added to the statement of facts included in the Pre-Sentence Report:

"The total amount of IV Capital investor funds that Mr. Parrish converted to his own use was $1.046 million. He caused $428,257.00 to be transferred from the GMCC account # 1401 at Bermuda Commercial Bank to an account (# xxxxxx2091) he had established under the name of "L. Michael Parrish" at Chevy Chase Bank (later Capital One) in Frederick, Maryland, and also caused an additional $618,104.00 in funds from the GMCC account # 1401 to be transferred to an account (# xxxxxx5605) he maintained in the name of GAM, LLC at a PNC Bank branch located near his home in Walkersville, Maryland. Mr. Parrish then drew upon these funds to meet various personal expenses, as detailed above. Mr. Parrish used $13,315.20 in IV Capital investor funds from the GAM, LLC account to pay for the golf outing for himself and his friends at Barefoot resort in Myrtle Beach, South Carolina in May 2008, and he used an additional $16,823.24 in IV Capital investor funds drawn from the GAM, LLC account to purchase the 2009 Harley Davidson FXDF motorcycle in September 2008."

10. The Defendant maintains that the Court should apply a downward departure or variance equivalent to **two (2)** offense levels on the ground that the amount of the loss overstates the seriousness of his criminal conduct, since approximately $5.2 million of the $9.2 million in funds that were taken in by his scheme were recycled to the investors as "profit" payments, and the actual net loss resulting from the scheme was approximately $4 million. The government will oppose this request, although it acknowledges that for restitution purposes, the amount owed by the defendant will be calculated pursuant to 18 U.S.C. § 3663A(b).

If the Defendant wishes to argue for any other factor that could take the sentence outside of the advisory guidelines range, he agrees that his counsel will notify the Court, the United States Probation Officer and government counsel at least thirty (30) days in advance of sentencing of the facts or issues he intends to raise, and will provide at that time a summary of the facts or expert opinions upon which he expects to rely.

### The Parties' Respective Positions at Sentencing

11. (a) This Office agrees that at the time of sentencing, it will not seek or request a sentence of incarceration for the defendant that is greater than **11 years, or 132 months**. At the time of sentencing, this Office will also move to dismiss the remaining open counts against the Defendant.

(b) The defendant agrees that at the time of sentencing, he will not request or seek the imposition of a sentence of incarceration that is less than **66 months**.



The defendant understands that these limitations are not binding upon the Court, which may impose a sentence that is greater than 132 months or less than 66 months.

12. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment this Office has agreed to dismiss at sentencing.

### Restitution

13. The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct that the Court finds at sentencing. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

### Collection of Financial Obligations

14. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

The Defendant will promptly submit a completed financial statement to the United States Probation Office, in such form as that Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

### Waiver of Appeal

15. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

7

RWB

(a) The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

(b) The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to challenge on appeal the reasonableness of any term of imprisonment to the extent that it exceeds **132 months' imprisonment**; (ii) and this Office reserves the right to challenge on appeal the reasonableness of any term of imprisonment to the extent that it is below **66 months' imprisonment**.

(c) Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

(d) The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

16. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

8



### Court Not a Party

17.     The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

18.     This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

9

*KWB*

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Jefferson M. Gray
Assistant United States Attorney

    I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

5-20-2013
Date

_____
Larry Michael Parrish

    I am Mr. Parrish's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

5/17/2013
Date

_____
Robert W. Biddle, Esq.

10

## ATTACHMENT A
## STATEMENT OF FACTS

The parties agree that had this matter proceeded to trial, the government could have presented testimonial and documentary evidence sufficient to establish the following facts beyond a reasonable doubt.

From in or about November 2005 and continuing until at least October 2009, defendant Larry Michael Parrish (Mr. Parrish), a resident of Walkersville, Maryland, and others, solicited dozens of potential investors to make investments in IV Capital, Ltd. (IV Capital), which Mr. Parrish represented to be a "proprietary trading company" engaged in the business of trading stocks, bonds, futures, options, currencies, precious metals and other types of securities and debt instruments on various international exchanges. In the course of these solicitations, Mr. Parrish made numerous false representations to potential investors, including the following:

- that he and his "partners" had substantial funds of their own invested with the company;
- that IV Capital had $20 million or more under management;
- that IV Capital had been operating successfully since the late 1990s;
- that IV Capital had established "a minimum gross profit margin each month of 5%," and that the proceeds generated by its trading activities would be divided equally between IV Capital and its investors (Mr. Parrish told some investors who invested smaller amounts of money that the return on their investments would be 2% monthly);

RWB

- that all invested funds would be deposited and would remain in an escrow account, which would not be actively traded and would remain available for redemption by the investors upon reasonable notice, and that the funds in this escrow account would be used only to secure a line of credit issued by a financial institution to IV Capital to finance its trading activities;
- that the trading transactions carried out by IV Capital presented an extremely low risk of loss;
- that IV Capital's management of its accounts would also be subject to the evaluation of top licensed professional third parties.

These representations were untrue. Mr. Parrish did not invest any funds of his own into IV Capital; all of the company's funds came from investments tendered by the individuals Mr. Parrish and others had solicited. The company never had as much as $20 million under management; instead, the total amount of funds invested with IV Capital over the course of its three-year-plus history was approximately $9.2 million, and the maximum funds available to it at any particular point in time were substantially less than that. IV Capital had no employees aside from Mr. Parrish, although several individuals – Mr. R.D., Mr. D.B., and Mr. D.S. – received commissions in return for their tracking and making the monthly "profit" payments that were owed to groups of investors whom they represented.

Nor was it true that funds received from IV Capital investors were held in an escrow account and were used solely to secure a line of credit, which provided the actual working capital for IV Capital's trading activities. Instead, the funds were maintained in

2



a bank account at Bermuda Commercial Bank in the name of Global Management & Consultancy Corporation, Ltd. (GMCC). Investors were instructed to wire their funds to the GMCC account # 1401 at Bermuda Commercial Bank, and those funds were used to pay off other investors, for personal expenses, and for unsuccessful trading activities, rather than being used as promised to secure a line of credit.

The only individuals who conducted trading activity on behalf of IV Capital were Mr. Parrish and Mr. K.B., a trader whom Parrish had known for a number of years, and to whom he provided $720,000 in IV Capital investor funds as working capital for trading purposes. Mr. Parrish used another $2,218,500 in IV Capital investor funds to conduct trading activity on his own through a company called Interactive Brokers. The trading activity that Mr. Parrish and Mr. K.B. conducted was not low risk; instead, both Parrish and Mr. K.B. traded almost exclusively in options and futures contracts, which involved high levels of risk and often resulted in significant losses on individual transactions. Mr. Parrish and Mr. K.B. were both notably unsuccessful in their trading activities, ultimately losing virtually the entire $2.938 million in IV Capital investor funds that was allocated for this purpose.

IV Capital's investors were not told of these losses. Instead, IV Capital's investors received monthly payments that were identified as "profit" payments, and which appeared to reflect that the company was meeting its target of a minimum monthly return of 5%. In fact, these payments were simply drawn from principal invested in IV Capital by its investors on an ongoing basis. Of the total of $9.2 million that was tendered by IV Capital investors and transmitted by wires from their financial institutions in the United States to the GMCC account # 1401 at Bermuda Commercial



Bank, $5.2 million was then sent directly to investors or was routed from the GMCC account to the banks used by Mr. Parrish's agents, who then prepared the monthly statements and issued the "profit" payments to the investors for whom they were responsible.

Mr. Parrish's representation that IV Capital's management of its accounts was "subject to the evaluation of top licensed professional third parties" was also untrue. The company's books and records were never audited or reviewed by auditors

After subtracting the $5.2 million in "profit" payments that were recycled to IV Capital's investors and the $2.938 million that was used and lost in trading activities, the remaining funds that were received from IV Capital investors was converted to Mr. Parrish's own use. Mr. Parrish drew upon these funds to meet various personal expenses, including debit card purchases, car payments and leases, credit card payments, shopping for clothing, furniture, electronic equipment, personal fitness equipment, and other consumer goods, buying groceries and liquor, paying the rent on his family's home, paying for utility bills, paying for restaurant meals, and paying for entertainment and vacation expenses, including use of funds for a golf outing for himself and a number of friends at Barefoot resort in Myrtle Beach, South Carolina in May 2008, and funds to purchase a 2009 Harley Davidson FXDF motorcycle in September 2008.

On or about December 10, 2008, in furtherance of the scheme or artifice to defraud set forth in Count 18 of the Indictment, Mr. Parrish knowingly and willfully caused an international wire transfer in the amount of $32,665.00 consisting of funds obtained from IV Capital investors to be made from the GMCC account # 1401 at

4



Bermuda Commercial Bank in Hamilton, Bermuda to the GAM, LLC account (# 5605) established by Mr. Parrish at PNC Bank in Walkersville, Maryland. Mr. Parrish subsequently expended these funds for his own personal purposes.

